UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

DARYL WHEELER,                        )
                                      )
            Plaintiff,                )
                                      )
v.                                    )    Case No. 13-CV-0421-CVE-TLW
                                      )
SPIRIT AEROSYSTEMS, INC.,             )
                                      )
            Defendant.                )

**CORRECTED OPINION AND ORDER**[1]

Now before the Court is Defendant's Motion for Summary Judgment and Brief in Support Thereof (Dkt. # 54). Defendant Spirit Aerosystems, Inc. (Spirit) seeks summary judgment on plaintiff's claims of age and gender discrimination. Plaintiff responds that defendant fails to consider her entire work history, and that there is sufficient evidence in the summary judgment record to show a genuine dispute of material fact on her employment discrimination claims.

**I.**

Spirit, a manufacturer of airplane component parts, employed Daryl Wheeler in a position classified as a 670D processor. Wheeler is a female over the age of 40. As a 670D processor, Wheeler worked in the paint shop to prepare parts for painting. Dkt. # 55, at 8-9. The paint shop is divided into two departments, Department 965 and Department 973, and Wheeler has worked in both departments during the course of her employment. Id. at 8. Each department operates in different buildings, and processors are assigned to a building. Wheeler worked in Buildings 1 and

---

[1]   This corrected opinion and order is entered to add the word "not" in the first sentence of the first full paragraph on page 17. The opinion and order remains the same in all other respects and the Court's decision is not affected by the correction.

610 while working in Department 973, and she worked in Building 605 when she was assigned to Department 965. Dkt. # 56, at 2. Each building houses work on different airplane parts, but the job duties of a processor are consistent regardless of to which building the processor is assigned. Dkt. # 54-4, at 2. These duties include "sanding parts, masking parts to protect certain areas from paint, mixing paint, primer, or bond primer, spraying parts, hanging parts on an assembly line, and running a crane to coat the parts with chemicals." Id. Wheeler is a member of the United Auto Workers Union (UAW) and her employment with Spirit was governed by a collective bargaining agreement (CBA). Dkt. # 54-3, at 3. The CBA governs requests for shift transfers and managers cannot transfer employees to another shift in violation of the CBA. As to employee requests for shift transfers, the CBA provides that "Employees with an active request for shift transfer will be transferred in order of their seniority to the shift of their choice to fill vacancies within their classification and labor grade." Id. at 88. When no vacancies are available and a request for shift transfer has been filed, the employee "will be transferred to displace the least senior employee in [her] classification and labor grade in [her] department on the shift of [her] choice provided [she] has more seniority than such least senior employee." Id. The transfer request becomes void if there is no less senior employee to displace. Id.

In 2009, Wheeler was assigned to the first shift in Building 610 and her direct supervisor was Joe Sauer. Dkt. # 55, at 13. On August 7, 2009, Sauer transferred Wheeler to building 605 but she remained on the first shift. Id. at 14. The transfer did not result in any loss of pay, benefits, job classification, or seniority status for Wheeler. Dkt. # 54-3, at 9. Wheeler testified in her deposition that she did not want to be transferred to Building 605, but that she has no basis to believe that the transfer was made because of her age or gender. Dkt. # 55, at 14; Dkt. # 66, at 6. Sauer states that

2

he transferred Wheeler because Building 605 needed an additional processor, and he believed that the transfer would be beneficial for Wheeler. Dkt. # 54-4, at 1. Wheeler was not completing her work in Building 610, which was a high volume work area, and Sauer thought that the slower pace of Building 605 would help Wheeler improve. Id. at 2. Wheeler worked the first shift in Building 605 from August 7, 2009 to July 29, 2011. Dkt. # 55, at 15.

In June 2011, Wheeler made an internal complaint alleging that she was subject to unlawful harassment and discrimination, and Brandy Bousquet was assigned to conduct an investigation of Wheeler's allegations. Dkt. # 56, at 4. Over a two month period, Bousquet interviewed Wheeler, eight witnesses, and two respondents, and Bousquet prepared a written report detailing her interviews. Id. at 260. Wheeler made the following allegations:

(A) Daryl Wheeler alleges that Kirby Brumble watches her to see if she is working or not; she does not know if he watches anyone else in this manner, but she feels like she is the only one he watches. . . .

(B) Wheeler alleges that [Vincent] Lee will make comments about Wheeler not being able to work overtime; he will say things such as it is "just the six of us" working overtime. She feels this points that she is not able to work overtime.

(C) Wheeler alleges that [Vincent] Lee would make comments to her that were derogatory and made her feel like she was stupid. . . .

(D) Wheeler alleges that after she went to her Union Steward, Brendan O'Shea, about Lee, Lee stopped talking to her and started limping when he walked past her. Wheeler stated she walks with a limp.

(E) Wheeler alleges that sometimes when she walks up to the other members of the crew talking to see what is going on, they will stop talking and split up. . . .

Id. at 261-62. Bousquet concluded that the facts gathered during her investigation did not confirm that any violation of Spirit's employment discrimination policies had occurred. Id. at 266. Bousquet

noted that Wheeler's complaints about co-worker Jack Goodnight's treatment[2] of the entire crew were referred to the Employee Relations Office (ERO), and an ERO representative met with Goodnight on June 28, 2011. Id. at 267 n.2. In addition, Wheeler's entire crew was required to participate in equal employment opportunity training (EEO), even though Bousquet's report concluded that no discrimination occurred. Id. at 265. On August 31, 2011, Bousquet informed Wheeler of her findings and Wheeler signed a letter acknowledging Bousquet's findings. Id. at 284. The letter advised Wheeler that retaliation for filing a complaint of discrimination was prohibited and that Wheeler should contact Spirit's EEO office if she believed that she being retaliated against in any way. Id.

On June 23, 2011, Wheeler submitted a request to be transferred to the second shift, and her request was approved. Dkt. # 55, at 23. Wheeler worked the second shift in Building 605 from July 29, 2011 to January 4, 2013. Wheeler's transfer to the second shift moved her away from co-workers that were the subject of her discrimination complaint. Dkt. # 56, at 5. On November 20, 2012, Wheeler requested to be transferred to the first shift. Id. at 285. While her transfer request was pending, Wheeler reported that someone had tampered with her locker. Id. at 286. On December 14, 2012, Wheeler came to work and noticed that aluminum wiring had been wrapped around the padlock on her locker, but the wiring was easily removed and Wheeler could use her locker. Id. On December 17, 2012, Wheeler's padlock was again wrapped with aluminum wiring, but this time she could not open the padlock and several co-workers came to help her. Id. Her co-

---

[2]   Plaintiff's response suggests that Goodnight was a supervisor for Spirit or that he had supervisory authority over plaintiff. Dkt. # 66, at 10. However, plaintiff testified in her deposition that Goodnight has never been a supervisor and that he is an hourly employee just like plaintiff. Dkt. # 55, at 15.

4

workers could not open the padlock, and a security officer was called to remove the padlock using a bolt cutter. Id. Wheeler also noticed that a Christmas tree that had been sitting on top of her locker was missing, but the Christmas tree was later found behind Wheeler's locker. Id. Debra Mitchell, a Spirit human resources employee, conducted an investigation and interviewed several of Wheeler's co-workers. Mitchell could not determine who vandalized Wheeler's locker, but she made the following comments about Wheeler's relationship with her co-workers:

> During the investigation there was a recurring message that many crew members choose not to engage in casual conversation with [Wheeler] because of a prior history with her. Of paramount concern to them is that to do so is to inadvertently open themselves up to be misinterpreted resulting in unfavorable action. Although there are definite attitudes of employees who self-check, or minimize conversation with [Wheeler], there were no overt sentiments of maliciousness or hostility observed towards her. On the contrary there was care and concern displayed.

Id.

On January 4, 2013, Wheeler's transfer request was approved and she was assigned to Building 610 in Department 973. Id. at 6-7. The transfer did not result in a reduction of pay or benefits, job classification, or seniority for Wheeler. Id. at 10. There was not a vacancy in Building 610 but there was an employee with less seniority, and Wheeler displaced or bumped the employee to accommodate Wheeler's transfer request. Id. at 7. Wheeler's supervisor in Department 973 was Mike Byford. Wheeler did not meet certain budget expectations in Building 610, and Byford moved Wheeler to Building 1. Dkt. # 54-4, at 2. Wheeler did not object to the transfer and she thought the work in Building 1 would cause less aggravation for her carpal tunnel syndrome. Dkt. # 55, at 36. Michelle Medlock was Wheeler's first-level supervisor in Building 1. Dkt. # 54-6, at 1. Even though Wheeler's request for a voluntary transfer was approved, she filed a complaint of age and gender discrimination with the human resources department against Goodnight, because she

5

believed that Goodnight attempted to interfere with her transfer request. Dkt. # 54-7, at 2. Kris Gonzalez, an EEO investigator for Spirit, was assigned to investigate Wheeler's allegations. Id. Wheeler's primary complaints about Goodnight's conduct were that he allegedly asked the human resources department not to transfer Wheeler, that he called Wheeler a bitch, that he would not let Wheeler operate the crane,[3] and that the transfer to Building 1 was retaliation for previously filing a complaint of discrimination. Dkt. # 55, at 36. As to Wheeler's allegation concerning interference with her transfer request, she alleged that she saw Goodnight and other male employees in Building 605 meeting with the human resources department and she had heard rumors that these employees did not want her to work in Building 605, and she inferred from her observation that Goodnight was interfering with her transfer request. Id. at 29. Gonzalez determined that the UAW, not the human resources department, handled Wheeler's transfer request, and that Wheeler was properly transferred to a building where the least senior processor was assigned. Dkt. # 54-7, at 2. Wheeler's allegations about Goodnight's refusal to let her operate the crane were based on an alleged statement made by Goodnight in July 2011, and the issue was resolved by Wheeler's manager and the human resources department in 2011. Dkt. # 55, at 27. In her deposition, Wheeler clarified that the "bitch" comment was made between 2009 and 2011 and that she was uncertain if the comment was about her or if it was made by Goodnight. Id. at 37-38. Finally, Gonzalez discovered no evidence tending to corroborate Wheeler's allegation that she was transferred to Building 1 in retaliation for previously filing a complaint of discrimination. Dkt. # 54-7, at 3.

---

[3]  It is unclear why Wheeler complained about Goodnight's alleged refusal to let her operate the crane, because she states in her brief that "[w]orking on the crane is regarded as a less desirable position because it is boring and does not involve physical activity." Dkt. # 66, at 9.

6

On February 13, 2013, Sauer observed that Wheeler was not working during her shift and asked her why she was not working. Dkt. # 54-4, at 2. Sauer did not discipline Wheeler. Dkt. # 55, at 40. Wheeler filed a union grievance against Sauer alleging that she was harassed, but she did not allege that Sauer harrassed her due to her age or gender. Dkt. # 54-4, at 13. The grievance was filed under the category of an "ERO - Personal Conduct" complaint, instead of an EEO discrimination complaint. Id. at 14. Wheeler states that she was not retaliated against by Sauer for filing a union grievance. Dkt. # 55, at 43. However, there was a subsequent incident in April 2013, in which Sauer found Wheeler reading a book during work hours. Id. at 44. Wheeler admits that she was reading a book that was not work related and that Sauer told her to find some work to do, but she claims that Sauer did not discipline a male co-worker who was using his cell phone. Id. However, she does not know if Sauer saw the male co-worker when he spoke to Wheeler. Id.

On March 11, 2013, Wheeler filed a formal charge of discrimination with the Equal Employment Opportunity Commission (EEOC), although she had previously submitted a general intake questionnaire with the assistance of counsel on January 24, 2013. Dkt. # 66-13. The charge states that Wheeler was alleging that she was discriminated against on the basis of her age and gender. A document attached to the charge explains that Wheeler had medical conditions that made certain aspects of her job more difficult, but she did not allege that she was discriminated against because of a disability. Dkt. # 54-8. After the EEOC charge had been filed, Wheeler filed a union grievance against her first-level supervisor, Medlock, because Medlock assigned Wheeler job duties that conflicted with her medical restrictions. Dkt. # 54-6, at 7. Medlock states that she was unaware of the nature of Wheeler's medical restrictions and that she believed that Wheeler could perform the

7

work she was assigned. Id. at 2. After reviewing the grievance, Medlock assigned Wheeler to different light duty work and the grievance was resolved. Id. at 6.

Plaintiff filed this case in Tulsa County District Court alleging claims of age and gender discrimination in violation of federal law and a claim of intentional infliction of emotional distress under Oklahoma law. Dkt. # 2, at 2-8. Spirit removed the case to this Court on the basis of federal question jurisdiction. Dkt. # 2, at 2. Spirit filed a motion to dismiss (Dkt. # 11) the intentional infliction of emotional distress claim under Fed. R. Civ. P. 12(b)(6), and plaintiff's employment discrimination claims to the extent they were based on a failure to accommodate theory. The Court granted the motion to dismiss. Dkt. # 20.

**II.**

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

Defendant argues that plaintiff cannot rely on discrete events of alleged discrimination that occurred more than 300 days before she filed her EEOC charge, and plaintiff's claims are in part time-barred. To the extent that plaintiff's claims are not time-barred, defendant argues that plaintiff has not shown that an adverse employment action occurred and plaintiff cannot establish a prima facie case of age or gender discrimination. Plaintiff responds that her January and March 2013 transfers occurred within 300 days of the submission of her general intake questionnaire, and those claims are not time barred. She also argues that two events qualify as adverse employment actions and that she can establish each element of a prima facie case of gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII), and age discrimination under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.

9

**A.**

"Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII." Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996) (internal quotation marks and citation omitted). To exhaust administrative remedies, a plaintiff must timely file a charge of discrimination with the EEOC. See 42 U.S.C. § 2000e-5(b). For a charge to be timely in a deferral state like Oklahoma,[4] the charge must be filed within 300 days of the last discriminatory act. See id. Even if a charge is timely filed, acts outside of the 300 day period may not be used as evidence to prove a claim of discrimination but may be used as background information. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). If the plaintiff alleges that acts outside of the statutory time period contributed to a hostile work environment, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period."[5] Tademy v. Union Pacific Corp., 520 F.3d 1149, 1156 (10th Cir. 2008). However, each discrete act of discrimination starts its own 300 day limitation period for filing a charge as to that act. Haynes v. Level 3 Communications, LLC, 456 F.3d 1215, 1222 (10th Cir. 2006).

In this case, plaintiff filed a charge of discrimination on March 11, 2013. However, plaintiff argues that she submitted a general intake questionnaire to the EEOC on January 24, 2013, and this

---

[4] Whether a state is deferral or non-deferral depends on the existence of state or local fair employment practice agencies. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002); Shempert v. Harwick Chem. Corp., 151 F.3d 793, 796 n.3 (8th Cir. 1998).

[5] Plaintiff has clarified that she is not seeking relief under a hostile work environment theory. Dkt. # 66, at 5.

should be the date to determine whether plaintiff's employment discrimination claims are timely. Under Federal Express Corp. v. Holowecki, 552 U.S. 389 (2008), a document can be treated as a charge of discrimination if it "can reasonably be construed to request agency action and appropriate relief on an employee's behalf . . . ." Id. at 404. The document must also provide certain minimum information about the plaintiff's claims, including the name of the employer and some allegations concerning the alleged discrimination. Id. at 401-02. As to the plaintiff's request for relief, the Court must determine under an objective standard whether the plaintiff's document can be construed as a request for the EEOC to take action. Hawthorne v. Vatterott Educational Centers, Inc., 2010 WL 3258560, *3 (N.D. Okla. Aug. 17, 2010). The Court has reviewed plaintiff's general intake questionnaire and finds that it can be treated as a charge of discrimination under Holowecki.[6] The questionnaire identifies the plaintiff and her employer and it includes a short narrative describing the alleged discrimination. Dkt. # 66-13. The questionnaire states that defendant allegedly engaged in age and gender discrimination, and she asks the EEOC to investigate her claims of discrimination. Id. at 7. Plaintiff's general intake questionnaire meets the requirements of Holowecki to be treated as a formal charge of discrimination, and the Court will use the date of January 24, 2013 to determine what events occurred within 300 days of the filing of plaintiff's charge.

---

[6] Plaintiff suggests that the Court should liberally construe her questionnaire in determining if it qualifies as a charge of discrimination, because such questionnaires are ordinarily filed by unrepresented parties. See Dkt. # 66, at 15 (citing Romero v. Union Pacific Railroad, 615 F.2d 1303, 1311 (10th Cir. 1980)). In this case, plaintiff's general intake questionnaire was prepared with the assistance of counsel and it was actually submitted to the EEOC by plaintiff's counsel. Dkt. # 66-13.

**B.**

Plaintiff asserts that defendant discriminated against her in violation of the ADEA and Title VII, and she alleges that she was subject to disparate treatment because of her age and gender. Defendants argue that plaintiff cannot establish a prima facie case of age or gender discrimination, because she has not suffered an adverse employment action.

Plaintiff has produced no direct evidence of age discrimination and, in reviewing an age discrimination claim based on circumstantial evidence, the Court must apply the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under this framework, the plaintiff bears the initial burden to establish a prima facie case of discrimination. Sanders v. Southwestern Bell Telephone, L.P., 544 F.3d 1101, 1105 (10th Cir. 2008). To establish a prima facie case of age discrimination, a plaintiff must show: (1) that she is within the protected age group; (2) that she suffered an adverse employment action; (3) that she was qualified for the position; and (4) she was treated less favorably than others not in the protected class. Jones v. Oklahoma City Public Schools, 617 F.3d 1273, 1279 (10th Cir. 2010). If the plaintiff meets her burden, the employer must "come forward with some legitimate, non-discriminatory reason for the adverse employment action." Hinds v. Sprint/United Management Co., 523 F.3d 1187, 1195 (10th Cir. 2008). If the employer produces a legitimate, non-discriminatory reason for its decision, the burden shifts to the plaintiff "to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004). The mixed-motive analysis established in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), does not apply to claims under the ADEA, and a plaintiff asserting an age discrimination claim under the ADEA retains the "burden

12

of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." Gross v. FBL Financial Servs., Inc., 557 U.S. 167, 177 (2009). The Tenth Circuit has found that Gross was consistent with existing Tenth Circuit precedent, and a plaintiff asserting an ADEA claim has the burden to prove that "age was the factor that made a difference," even if age was not the sole motivating factor for an employer's decision. Jones, 617 F.3d at 1277.

Plaintiff has no direct evidence of gender discrimination claim, and her gender discrimination claim is governed by a similar, but somewhat less burdensome, burden-shifting analysis. To establish a prima facie case of discrimination under Title VII, a plaintiff must show that "(1) [she] belongs to a protected class; (2) [she] suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." EEOC v. PVNF, LLC, 487 F.3d 790, 800 (10th Cir. 2007). A gender discrimination plaintiff can rely on the Price Waterhouse mixed motive theory to prove her discrimination claim and, under this standard, the employee must prove that the employer was in part motivated by a discriminatory purpose when taking an adverse employment action toward the employee. Hysten v. Burlington Northern Santa Fe Ry. Co., 415 F. App'x 897, 912 (Mar. 16, 2011).[7]

There is no dispute that plaintiff is a member of a protected class based on her age and gender, but defendant argues that plaintiff did not suffer an adverse employment action. This is an essential element of plaintiff's burden in a prima facie case of age and gender discrimination. Based on plaintiff's response (Dkt. # 66) to defendant's motion for summary judgment, she could be arguing that her January and March 2013 transfers were adverse employment actions. The Tenth

---

[7] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

Circuit liberally defines the term "adverse employment action," and "[s]uch actions are not simply limited to monetary losses in the form of wages or benefits." Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998). "Conduct rises to the level of 'adverse employment action' when it 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Stinnet v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003) (quoting Sanchez, 164 F.3d at 532)). Actions that merely inconvenience an employee or alter the employee's job responsibilities are not considered adverse employment actions. Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007). A purely lateral transfer, even if involuntary, is not considered an adverse employment action if the employee receives the same salary and benefits and the employee's responsibilities are substantially similar. Sanchez, 164 F.3d at 532. An assignment to a new shift without any difference in pay or benefits is not an adverse employment action, even if some inconvenience results to the employee. Daniels v. United Parcel Service, Inc., 701 F.3d 620, 635 (10th Cir. 2012). In the context of employment discrimination claims, an involuntary transfer is not considered an adverse employment action unless it is accompanied by a loss of pay or benefits or the significant alteration of an employee's duties. Vann v. Southwestern Bell Telephone Co., 179 F. App'x 491, 497 (10th Cir. May 3, 2006) (explaining that an involuntary transfer by itself can be an adverse employment action in a First Amendment retaliation case but not in a Title VII case).[8]

Plaintiff initially argues that her January 2013 transfer to Building 610 was an adverse employment action. She asks the Court to treat this as an involuntary transfer, because she wanted

---

[8] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1: 10th Cir. R. 32.1.

to be transferred to the first shift in Building 605 and her transfer was not approved precisely as she requested. Dkt. # 66, at 18. The evidence shows that plaintiff's transfer request form did not actually state a preference for a particular building, and the purpose of the transfer request was to transfer from the second shift to the first shift. Dkt. # 66-10. Plaintiff's request to transfer to the first shift was approved, and she was transferred in accordance with the seniority requirements of the CBA. Dkt. # 54-7, at 2. Plaintiff's pay and benefits remained the same after her transfer and she was still classified as a processor after the transfer. Plaintiff alleges that Goodnight spoke to a human resources employee in an attempt to prevent plaintiff from transferring to the first shift in Building 605, but this argument fails for two reasons. First, plaintiff has offered no evidence that this actually occurred. At best, plaintiff heard rumors that Goodnight did not want plaintiff to work on his shift and she observed Goodnight and others meeting with the human resources department. Dkt. # 66-4, at 99-100. Plaintiff does not actually know what was said at the meeting. Id. at 101-02. The EEO investigator interviewed Goodnight and the human resources employee, Mitchell, and they both confirmed that Goodnight expressed concern that plaintiff had previously experienced issues while working on the same shift as Goodnight. Dkt. # 54-7, at 2. The investigator found no evidence that Goodnight made any statement to the effect that plaintiff should not be transferred to the first shift in Building 605. Id. Second, even if Goodnight actually attempted to interfere with transfer, neither Goodnight nor human resources had any control over plaintiff's transfer and the decision to transfer was made solely by the UAW. Id. Plaintiff was transferred to a position on the first shift in a building with the least senior employee as required by the CBA. Id. The Court finds that plaintiff's transfer to the first shift in Building 610 was voluntary and it was made in accordance with the CBA. The evidence also shows that plaintiff was at all times classified as a processor with

15

the same pay, benefits, responsibilities, and seniority, and her voluntary transfer to Building 610 cannot be classified as an adverse employment action.

Plaintiff also argues that her March 2013 transfer to Building 1 was an adverse employment action, because the transfer was involuntary and she was assigned different duties following the transfer. Dkt. # 66, at 19-20. Just as with the January 2013 transfer, plaintiff's pay and benefits were unchanged and she was still classified as a processor following the transfer. Although plaintiff claims that this was an involuntary transfer, plaintiff states in her response that Building 610 was a high volume building and her medical restrictions made it difficult for her to keep up with the volume of work in Building 610. Id. at 8. This is supported by the defendant's stated reason for transferring plaintiff out of Building 610, because her supervisor in Building 610 found that plaintiff was not meeting "budget expectations."[9] Dkt. # 54-6, at 1. Plaintiff argues that her new supervisor, Medlock, changed plaintiff's job responsibilities upon her transfer to Building 1 and these differences in responsibilities were significant enough for the transfer to qualify as an adverse employment action. However, Medlock has submitted an affidavit stating that she "misunderstood the nature of" plaintiff's medical restrictions when plaintiff was transferred to Building 1, and she immediately assigned plaintiff to "different light duty" when the matter was brought to her attention following plaintiff's union grievance. Id. at 2. Even if the transfer initially resulted in somewhat different duties, plaintiff does not dispute that she was classified as a processor before and after the transfer to Building 1, and her official job description did not change. To the extent the Medlock

---

[9] Plaintiff argues that this is a vague explanation for the transfer. Dkt. # 66, at 19-20. However, plaintiff admits that the she had medical restrictions and there is no dispute that Building 610 is a high volume building and, when viewed in context of the evidence, the explanation can reasonably be construed to mean that plaintiff was not meeting performance expectations in Building 610.

16

initially assigned plaintiff duties inconsistent with plaintiff's medical restrictions, the matter was corrected as soon as plaintiff raised the issue and there is no evidence that there was any intent by defendant to assign plaintiff duties that she was unable to perform. The Court finds that plaintiff's pay, benefits, and job responsibilities were unchanged by her transfer to Building 1 and this transfer was not an adverse employment action. Plaintiff has not shown that the January or March 2013 transfers were adverse employment actions and plaintiff cannot establish a prima facie case of age or gender discrimination.

Even if plaintiff could establish a prima facie case of age or gender discrimination, this does not mean that there would be a genuine dispute as to a material fact that would preclude summary judgment in favor of defendant. At the second stage of the McDonnell Douglas analysis, the burden shifts to defendant to come forward with a legitimate, non-discriminatory reason for its actions. "The defendant's burden is merely to articulate through some proof a facially nondiscriminatory reason for the [action]; the defendant does not at this stage of the proceeding need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need prove that the reasoning was applied in a nondiscriminatory fashion." EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992). The Tenth Circuit has described the defendant's burden at this stage of the proceedings as "exceedingly light." Zamora v. Elite Logistics, Inc., 478 F.3d 1160, 1165 (10th Cir. 2007). Defendant states that plaintiff was voluntarily transferred in January 2013 because she requested a transfer, and plaintiff was subsequently transferred in March 2013 because she was not meeting "budget expecations." Although plaintiff claims that defendant's stated reasons were not the true reason for her transfers, defendant has come forward with legitimate, non-discriminatory reasons for transferring plaintiff and the burden shifts to plaintiff to show that

17

these reasons are pretextual.  Plotke v. White, 405 F.3d 1092,1099 (10th Cir. 2005); Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004).

"A plaintiff demonstrates pretext by showing . . . that the employer's proffered explanation is unworthy of credence."  Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quoting Rea v. Martin Marietta Corp., 29 F.3d 1450, 1455 (10th Cir. 1994)).  A plaintiff typically attempts to satisfy her burden by "revealing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"  Mackenzie v. City & County of Denver, 414 F.3d 1266, 1278 (10th Cir. 2005) (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997)).  A plaintiff's "mere conjecture" that the employer's explanation is pretext is not a sufficient basis to deny a motion for summary judgment.  Branson v. Price River Coal Co., 853 F.2d 786, 772 (10th Cir. 1988).  In the context of an age discrimination claim, the burden of persuasion remains with plaintiff at all times to show that age was the but-for cause of plaintiff's termination.  Smith v. City of Allentown, 589 F.3d 684, 691 (10th Cir. 2009).

Even if the Court were to assume that plaintiff could reach the pretext stage of the analysis, the Court would not find that she has met her burden to show a genuine dispute of material fact as to pretext.  Plaintiff argues that the number of grievances or complaints that she filed is evidence that defendant's stated reasons are pretextual, because "she has had to file 5 reports for harassment based on her age and gender, none of which have resulted in disciplinary action against younger male employees . . . ."  Dkt. # 66, at 22.  Plaintiff's statement does not accurately reflect the evidence. While she filed numerous complaints about her supervisors or co-workers, many of these complaints were in the nature of personal disagreements with co-workers, rather than alleged discriminatory

18

conduct, and defendant could not reasonably have viewed many of her complaints as containing allegations of employment discrimination. In addition, plaintiff cites no authority suggesting that the number of complaints of discrimination filed by a person tends to show that discriminatory conduct actually occurred. While it may show a person subjectively perceived that she was the victim of illegal employment discrimination, the number of complaints is not objective evidence tending to show that the discrimination actually occurred, and the number of complaints filed by plaintiff does not tend to show that defendant's stated reasons for transferring plaintiff was pretextual. Plaintiff argues that the stated reason for the March 2013 transfer was pretextual, because following the transfer plaintiff was given duties that conflicted with her medical restrictions and this did not remedy the perceived inefficiency in plaintiff's work in Building 610. Id. Medlock has explained that she misunderstood the nature of plaintiff's medical restrictions and the issue was corrected when it was brought to Medlock's attention. Dkt. # 54-6. While plaintiff may have initially been assigned duties that were difficult for her, the matter was corrected as soon as plaintiff raised the issue, and any issue as to plaintiff's duties in Building 1 following the transfer from Building 610 do not tend to show that defendant's stated reason for the transfer was pretextual. Finally, plaintiff argues that she filed a complaint against Sauer shortly before the March 2013 transfer, and there is a close temporal connection between the complaint and the transfer. Id. Plaintiff's February 2013 grievance against Sauer was treated as a personal conduct matter, instead of an employment discrimination matter, and plaintiff did not contest the defendant's treatment of this matter. See Dkt. # 54-4, at 13-14. Even if the February 2013 grievance occurred in somewhat close temporal proximity to plaintiff's March 2013 transfer, there is no evidence that plaintiff or defendant viewed her grievance as containing allegations of employment discrimination, and the fact

that plaintiff had a personal disagreement with Sauer does not support a finding that defendant may have engaged in intentional employment discrimination.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment and Brief in Support Thereof (Dkt. # 54) is **granted**. Defendant's motion in limine (Dkt. # 70) is **moot**. A separate judgment is entered herewith.

**DATED** this 20th day of January, 2015.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE